Renee Henderson **MARTINEZ**,
Plaintiff–Appellee,

v.

Robert **HOOPER**, Defendant–Appellant.

No. 97–4101.

United States Court of Appeals,
Seventh Circuit.

Argued May 21, 1998.
Decided July 8, 1998.

John P. DeRose, Anthony Capula (argued), DeRose & Associates, Burr Ridge, IL, for Plaintiff–Appellee.

Nelson A. Brown, Jr. (argued), Chicago Park District, Law Department, Chicago, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and COFFEY and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

We know the story about the surprised audience that went to see a fight and a hockey game broke out. We can only imagine that the audience gathered to see a kids' gymnastics show in Chicago's Rowan Park must have been similarly surprised when, before the somersaults started, one of the park's recreational leaders was hauled away in handcuffs by an off-duty police officer who claimed she was guilty of child abuse. Such is life in the big city.

A kids' gymnastics show in an urban park conjures up images of little Olga Korbuts and Nadia Comanecis frolicking around on mats and bars to the delight of an audience made up exclusively of parents, relatives, and friends of the little athletes. Such was the case, it would appear, when a gymnastics show was scheduled in Chicago's Rowan Park back in 1996. Many of the spectators on hand were there to see the students of Renee Martinez, a recreational leader employed by the park, strut their stuff. But the show, certainly for Martinez, got off to a rocky start.

Robert Hooper, a park supervisor (and Martinez' boss) with the Chicago Park District, was responsible for the gymnastics show which was to include students in a class taught by Ms. Martinez, an employee of the Park District. Just before the show was to start, Hooper told Martinez to get several children, who were not part of the show, off the gym equipment. She did so, but how she did it apparently ruffled the feathers of Jesse Gonzalez, the father of one of the children asked to get off the equipment. And Gonzalez, it turns out, was not to be messed with because he was an off-duty Chicago police officer.

According to Martinez, Gonzalez grabbed her and then proceeded to handcuff and abuse her in full view of the gymnastics show audience. Gonzalez then announced that

Martinez was under arrest for "child abuse" as he paraded the handcuffed Martinez out of the show. She was taken to Hooper's office. Martinez says that after 30 minutes of "mental and physical abuse and pain" she "reluctantly" told Gonzalez she was sorry. Gonzalez then let her go.

After the incident Martinez filed a charge with the Office of Professional Standards (OPS), the agency that investigates misconduct complaints against Chicago police officers. Before he knew that she had filed the charge, Hooper told Martinez that he did not think it was a good idea to file an OPS complaint and that the Park District would not like it if she did. He repeated this advice—or was it a warning?—the next day.

Apparently later there were rumors going around at various grade schools that Martinez abused children. Hooper refused to honor Martinez' request that he write letters or take other steps to quash the rumors. Attendance in Martinez' recreation classes slipped, and Hooper then cut back on her work hours. In addition, he accused her of falsely calling in sick. On another occasion he ordered her to sweep out the lobby of the Rowan Park field house—which she claims was not a part of her job description. She also claims that Gonzalez often called Hooper during the OPS investigation. Martinez eventually resigned her employment because of "unbearable working conditions."

Martinez then filed this suit, under 42 U.S.C. § 1983, against Hooper, the Park District, and Gonzalez. She claimed that Hooper retaliated against her for exercising her free speech rights under the First Amendment. Today we consider Hooper's appeal from a district judge's order denying his motion to dismiss in which he claimed that he enjoyed qualified immunity, that he cannot be sued in his official capacity, and that his actions, even if true, do not add up to retaliation.

■ In his individual capacity, Hooper is entitled to claim qualified immunity. He bases his claim on an argument that Martinez' speech was not on a matter of public concern. To be immune, his actions in retaliating against Martinez—retaliating is what she alleges he did—must not have been in

violation of clearly established law of which a reasonable person should have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Specifically, to find qualified immunity a court would have to find that a reasonable person would not have known that Martinez' OPS complaint against Gonzalez was free speech on matters of public concern or that, if it was, that fact was not clearly established when the incident occurred in 1996.

■ Ordinarily, to make this analysis of the free speech issue as it applies to public employees, we must first see whether the speech addresses a matter of public concern; the question must be determined by the content, form, and context of the statement. *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). If it is, we weigh Martinez' interest, as a citizen, in speaking out, or filing a complaint, with the Park District's interest in promoting efficient public service. *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

■ None of this is possible in this case at this time. Martinez' charge, i.e., or complaint, with the OPS—which must be examined to make a final evaluation of the content of the speech—is not even in the record. The qualified immunity issue is before us on a motion to dismiss the complaint, and the allegations in the complaint must be accepted as true; we must look to see whether there is any possible interpretation of the complaint under which it can state a claim. *Murphy v. Walker*, 51 F.3d 714 (7th Cir.1995). In order for the complaint to be properly dismissed it must appear beyond doubt that Martinez can prove no set of facts which would entitle her to relief. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

■ On the other hand, as we have said in *Gustafson v. Jones*, 117 F.3d 1015, 1018 (7th Cir.1997), a public employee, such as Martinez, "should be required to allege facts that could support a finding that the speech is on a matter of public concern." But, we also said, a plaintiff is not required to use magic words, nor are civil rights plaintiffs

held to a higher standard of pleading than other litigants. *Nance v. Vieregge,* 147 F.3d 589 (7th Cir.1998). Martinez has alleged facts which, if ultimately proved, would allow a finding that Gonzalez' actions constituted police misconduct.[1] In fact, she specifically alleges that her OPS charge alleges "police misconduct, a matter of public concern." Martinez has sufficiently pleaded her case to allege that she spoke out about police misconduct. Furthermore, it goes without saying that police misconduct is a matter of public concern. We have said, "Obviously, speech that focuses on police departments (and ultimately police protection and public safety) involve matters of great public concern." *Glass v. Dachel,* 2 F.3d 733, 741 (7th Cir.1993).

As to the context in which the speech arose, Martinez made her charge before the Chicago Police Department's OPS. Her charge did not involve her own employer, the Park District. It was a charge against a police officer to a police oversight body. Therefore, it is not clear from the complaint that Martinez was attempting to advance her own career. Nor is it clear from the complaint that OPS could offer any specific relief to Martinez. In other words, Martinez does not plead herself out of court. In fact, it appears likely that she chose a forum from which she could obtain no personal benefit, a fact which distinguishes her case from those such as *Yatvin v. Madison Metropolitan School District,* 840 F.2d 412 (7th Cir.1988) (in which a Title VII complaint was found to be essentially a matter of private concern because Yakvin was seeking only to advance her own career), or *Altman v. Hurst,* 734 F.2d 1240 (7th Cir.1984) (a case involving a police officer in a personnel dispute). In order to find qualified immunity at this stage of the proceedings on the basis which Hooper urges, we would, in effect, need to decide that a charge of police misconduct filed with a police oversight board could never be a matter of public concern. That is a step, of course, we will not take.

We agree with the district court that the motion is "premature." That said, we em-phasize that a decision as to whether the charge actually involves a matter of public concern must wait until the charge is in the record. When we get beyond the pleadings in this case, Martinez may have the job of proving that Hooper does not have a qualified immunity from suit. *Rakovich v. Wade,* 850 F.2d 1180 (7th Cir.1988) (en banc), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). We are not yet at that stage of the case.

Along with this interlocutory appeal from the qualified immunity decision, Hooper also appeals two other rulings over which he asks us to extend our pendent appellate jurisdiction. One issue is whether Hooper can be sued in his official capacity—is he a policymaker. The other is whether the allegations in the complaint are sufficient to state a claim for retaliation. The district court found that it was premature to say that Martinez could prove no set of facts which would show that Hooper was a policymaker and found that the allegations were sufficient to state a claim for retaliation. We see no reason to review those issues at the present time.

The decision of the district court is AFFIRMED.

---

1. Although it's not in the record, Hooper's counsel told us at oral argument that he thought Gonzalcz was disciplined by the OPS for abusing his authority.